# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARRY BOLGER, Individually And On Behalf Of All Others Similarly Situated, <br><br>                            Plaintiff, <br><br>     vs. <br><br> ANTONIO M. PEREZ, RICHARD S. BRADDOCK, HERALD Y. CHEN, ADAM H. CLAMMER, TIMOTHY M. DONAHUE, MICHAEL J. HAWLEY, WILLIAM H. HERNANDEZ, DOUGLAS R. LEBDA, KYLE P. LEGG, DELANO E. LEWIS, WILLIAM G. PARRETT, JOEL SELIGMAN, DENNIS F. STRIGL, LAURA D'ANDREA TYSON, DEBRA L. LEE, FRANK S. SKLARSKY, ANTOINETTE P. McCORVEY, PAUL DILS, THE SAVINGS AND INVESTMENT PLAN COMMITTEE (SIPCO), and JOHN DOES 1-20, <br><br>                            Defendants. | Civil Action: |

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiff, a participant in the Eastman Kodak Employees' Savings And Investment Plan (the "SIP")[1], covering substantially all employees of Eastman Kodak Company ("Kodak" or the "Company") and its affiliated companies (collectively, "Kodak" or the "Company"), individually and on behalf of all others similarly situated (the "Participants"), alleges as follows:

### INTRODUCTION

1.      Plaintiff brings this action on behalf of the Plans and all Participants and beneficiaries in the Plans to recover losses to the Plans for which the fiduciaries of the Plans are liable pursuant to Sections 409 and 502(a)(2) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109 and 1132(a)(2).  In addition, under ERISA § 502(a)(3), 29 U.S.C.

---

[1]      This action is also brought on behalf of the Kodak Employee Stock Ownership Plan (the "ESOP").  The SIP and ESOP are collectively referred to herein as the "Plans".

§ 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, a constructive trust, restitution, equitable tracing, and other monetary relief.

2.     From January 28, 2010 through the present (the "Class Period"), the Plans acquired and held shares of Kodak ("Kodak Stock" or "Company Stock"), which was offered as one of the retirement saving options in the Participant Contribution Component of the Plans.

3.     Defendants, each having certain responsibilities regarding the management and investment of Plans' assets, breached their fiduciary duties to the Plans and Participants by failing to prudently and loyally manage the Plans' investment in Kodak Stock by, among other things, (i) continuing to offer Kodak Stock as a retirement saving option; (ii)  continuing to acquire and hold shares of Kodak Stock in the Plans when it was imprudent to do so; (iii) failing to provide complete and accurate information to Participants regarding the Company's financial condition and the prudence of investing in Kodak Stock; and (iv) maintaining the Plans' pre-existing investment in Kodak Stock when it was no longer a prudent investment for the Plans.

4.     As a result of Defendants' fiduciary breaches, as alleged herein, the Plans have suffered substantial losses, resulting in the depletion of millions of dollars of the retirement savings and anticipated retirement income of the Plans' Participants.   Under ERISA, the breaching fiduciaries are obligated to restore to the Plans the losses resulting from their fiduciary breaches.

5.     Because Plaintiff's claims apply to the Participants as a whole, and because ERISA authorizes Participants such as Plaintiff to sue for plan-wide relief for breach of fiduciary duty, Plaintiff brings this as a class action on behalf of all Participants of the Plans during the

Class Period.  Plaintiff also brings this action as a participant seeking plan-wide relief for breach of fiduciary duty on behalf of the Plans.

6.      In addition, because the information and documents on which Plaintiff's claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiff's allegations are by necessity upon information and belief.  At such time as Plaintiff has had the opportunity to conduct additional discovery, Plaintiff will, to the extent necessary and appropriate, amend the Complaint or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the following Counts below.

## JURISDICTION AND VENUE

7.      *Subject Matter Jurisdiction*.  This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).  This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l).  In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

8.      *Personal Jurisdiction*.  ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of Defendants are residents of the United States, and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(l)(A), because they all would be subject to the jurisdiction of a court of general jurisdiction in this District.

9.      *Venue*.  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans were administered in this district, some or all of the fiduciary

breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary place of business in this district.

## PARTIES

### Plaintiff

10.     *Plaintiff Barry Bolger* is, and at all relevant times has been, a citizen of the State of New York.  Plaintiff Bolger is a former employee of Kodak and was a ward of the Defendants as set forth herein.  Plaintiff has suffered financial detriment in his Plans' holdings as a result of the actions and non-actions of the Defendants.

### Director Defendants

11.     *Defendant Antonio M. Perez* ("Perez") was, at all relevant times, a member of the Board of Directors (the "Board"). Defendant Perez was also, at all relevant times, the Company's Chief Executive Officer ("CEO").  During the Class Period, Defendant Perez was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans fiduciaries and with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

12.     *Defendant Richard S. Braddock* ("Braddock") was, at all relevant times, a member of the Board.  During the Class Period, Defendant Braddock was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans fiduciaries and with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans'

4

assets.

13.     **Defendant Herald Y. Chen** ("Chen") was, during part of the Class Period, a member of the Board.  During part of the Class Period, Defendant Chen was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans fiduciaries and with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.  Further, on December 21, 2011, Defendant Chen notified the Board of his resignation.

14.     **Defendant Adam H. Clammer** ("Clammer") was, during part of the Class Period, a member of the Board.  During part of the Class Period, Defendant Clammer was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans fiduciaries and with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.  Further, on December 21, 2011, Defendant Clammer notified the Board of his resignation.

15.     **Defendant Timothy M. Donahue** ("Donahue") was, at all relevant times, a member of the Board.  During the Class Period, Defendant Donahue was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans fiduciaries and with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

16.     ***Defendant Michael J. Hawley*** ("Hawley") was, at all relevant times, a member of the Board.  During the Class Period, Defendant Hawley was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans fiduciaries and with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

17.     ***Defendant William H. Hernandez*** ("Hernandez") was, at all relevant times, a member of the Board.  During the Class Period, Defendant Hernandez was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans fiduciaries and with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

18.     ***Defendant Douglas R. Lebda*** ("Lebda") was, at all relevant times, a member of the Board.  During the Class Period, Defendant Lebda was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans fiduciaries and with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

19.     ***Defendant Kyle P. Legg*** ("Legg") was, at all relevant times, a member of the Board.  During the Class Period, Defendant Legg was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans fiduciaries and with respect to the management of the Plans, he

possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

20.     **Defendant Delano E. Lewis** ("Lewis") was, at all relevant times, a member of the Board.  During the Class Period, Defendant Lewis was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans fiduciaries and with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

21.     **Defendant William G. Parrett** ("Parrett") was, at all relevant times, a member of the Board.  During the Class Period, Defendant Parrett was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans fiduciaries and with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

22.     **Defendant Joel Seligman** ("Seligman") was, at all relevant times, a member of the Board.  During the Class Period, Defendant Seligman was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans fiduciaries and with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

23.     **Defendant Dennis F. Strigl** ("Strigl") was, at all relevant times, a member of the Board.  During the Class Period, Defendant Strigl was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the

appointment of the Plans fiduciaries and with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

24.     *Defendant Laura D'Andrea Tyson* ("Tyson") was, during part of the Class Period, a member of the Board.  During part of the Class Period, Defendant Tyson was a fiduciary within the meaning of ERISA because she exercised discretionary authority or discretionary control with respect to the appointment of the Plans fiduciaries and with respect to the management of the Plans, she possessed discretionary authority or discretionary responsibility in the administration of the Plans, and she exercised authority or control with respect to the management of the Plans' assets.  Further, on December 29, 2011, Defendant Tyson notified the Board of her resignation.

25.     *Defendant Debra L. Lee* ("Lee") was, during part of the Class Period, a member of the Board.  During part of the Class Period, Defendant Lee was a fiduciary within the meaning of ERISA because she exercised discretionary authority or discretionary control with respect to the appointment of the Plans fiduciaries and with respect to the management of the Plans, she possessed discretionary authority or discretionary responsibility in the administration of the Plans, and she exercised authority or control with respect to the management of the Plans' assets. Further, on March 16, 2011, Kodak announced Defendant Lee decided, for personal reasons, not to stand for re-election to the Board in 2011.

26.     Defendants Perez, Braddock, Chen, Clammer, Donahue, Hawley, Hernandez, Lebda, Legg, Lewis, Parrett, Seligman, Strigl, Tyson, and Lee are hereafter collectively referred to as the "Director Defendants."

27.     The Director Defendants will appoint the Committee (defined below) to control

8

and manage the operation and administration of the SIP and Trust.  The members of Committee may, at the discretion of the Board, be employees of the Company.   The Director Defendants may at any time remove a member of Committee and appoint a successor.

**The Savings and Investment Plan Committee Defendant**

28.   ***Defendant The Savings and Investment Plan Committee*** (the "Committee") is the Plan Administrator and named fiduciary.  The Committee has the following powers:

> 3.03   OWERS AND DUTIES OF [THE COMMITTE]. [The Committee] will administer the Plan in accordance with its terms and will have all powers necessary to carry out the provisions of the Plan, except such powers as are specifically reserved to the Board, the Senior Vice President and Director, Human Resources, or some other person.  In addition to any implied powers and duties that may be necessary or appropriate to the conduct of its affairs, and without limitation by reason of enumeration, [the Committee will have the power, the duty, and the complete and exclusive discretion:
>
> (a)   to make, publish and apply such rules and regulations as it may deem necessary to carry out the provisions of the Plan, including rules and regulations for determining the qualified status of domestic relations orders in accordance with Code section 414(p), and for administering distributions pursuant to Qualified Domestic Relations Orders;
>
> (b)   to construe, interpret, and administer the terms of the Plan, to remedy any possible ambiguities in the terms of the Plan, and to determine conclusively, for all parties, all questions arising out of the interpretation or administration of the Plan;
>
> (c)   to determine conclusively the right of any person to benefits under the Plan and the amount of such benefits, including the determination of all questions relating to eligibility for participation and benefits; and
>
> (d)   to issue instructions to a Trustee to make disbursements from the Trust, and to make any other arrangement necessary or appropriate to provide for the orderly payment and delivery of disbursements from the Trust.

*See* Eastman Kodak Employees' Savings and Investment Plan (the "Plan"), Article III, § 3.03

29.     ***Defendant Antoinette P. McCorvey*** ("McCorvey") served as the Chairman of the Committee during the Class Period.  Defendant McCorvey signed the SIP's Form 11-K for the year ending December 31, 2010.  Defendant McCorvey also served as the Company's Chief Financial Officer ("CFO") since November 5, 2010, replaced Defendant Sklarsky.  Defendant McCorvey has held positions within the Company including, Director & Vice President of Investor Relations and Corporate Vice President.  During the Class Period, Defendant McCorvey was a fiduciary within the meaning of ERISA because she exercised discretionary authority or discretionary control with respect to the appointment of the Plans fiduciaries and with respect to the management of the Plans, she possessed discretionary authority or discretionary responsibility in the administration of the Plans, and she exercised authority or control with respect to the management of the Plans' assets.

30.     ***Defendant Frank S. Sklarsky ("Sklarsky")*** served as the Chairman of the Committee during the Class Period.  Defendant Sklarsky signed the SIP's Form 11-K filed for the year ending December 31, 2009.  Further, Defendant Sklarsky was the Company's CFO from November 13, 2006 until his departure in November 2010.  During the Class Period, Defendant Sklarsky was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans fiduciaries and with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

31.     ***Defendant Paul Dils*** ("Dils") served as a Plan Administrator for ESOP during part of the Class Period.  Defendant Dils signed the ESOP's Forms 5500 for year ending

December 31, 2009, and the year ending December 31, 2010. During the Class Period, Defendant Dils was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plans fiduciaries and with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

32.     ***Defendants John Does 1-20 ("John Does 1-20")*** are residents of the United States and are or were fiduciaries of the Plan during the Class Period. These defendants whose identities are currently unknown to Plaintiff, may include additional Kodak employees. Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

## CLASS ACTION ALLEGATIONS

33.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were Participants in or beneficiaries of the Plans at any time between January 28, 2010 and the present, inclusive (the "Class Period) and whose accounts held Kodak Stock or units in the Kodak Stock, but excluding all named defendants and their heirs or successors in interest.

34.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery.

35.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

11

(a)     whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

(b)     whether Defendants breached their fiduciary duties to Plaintiff and Members of the Class by failing to act prudently and solely in the interests of the Plans' Participants and beneficiaries; and

(c)     whether Defendants violated ERISA.

36.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained a diminution of vested benefits arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

37.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, ERISA, and complex civil and commercial litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

38.     Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members or the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical manner, be dispositive of the interests of the other members of the Class parties to the actions, or substantially impair or impede their ability to protect their interests.

39.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecuting separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole;

and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

40.     In the alternative, Plaintiff requests that the Court allow them to proceed under ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2).   Section 502(a)(2), 29 U.S.C. § 1132(a)(2) states that "[a] civil action may be brought —" "by the Secretary [of Labor], or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title[.]"   ERISA Section 409(a), 29 U.S.C. § 1109(a), sets forth that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable ***to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary***, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

(Emphasis added).

## The SIP

41.     The SIP was established in 1960 by the Company and was amended and restated in its entirety effective with respect to Participants with accounts on or after December 31, 1993, except as noted otherwise, to conform to the relevant provisions of the Internal Revenue Code of 1986 ("Code") and ERISA.

42.     The SIP is an "employee pension benefit plan" as defined by §§ 3(3) and (3)(2)(A) of ERISA, 29 U.S.C. §§ 1002(3) and 1002(2)(A).

43.     The SIP is legal entities that can sue or be sued.   ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).

44.     In this action for breach of fiduciary duty, the SIP is neither a plaintiff nor a

13

defendant.  Rather, Plaintiff requests relief for the benefit of the SIP and for the benefit of its Participants.

45.     The SIP is "defined contribution plan" or "individual account" Plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the SIP provides for individual accounts for each participant and for benefits based solely upon the amount contributed to the Participants' account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participants' accounts. Consequently, retirement benefits provided by the SIP are based solely on the amounts allocated to each individual's account.

46.     The SIP is a voluntary contribution plan whereby Participants make contributions to the SIP ("Voluntary Contributions") and direct the SIP to purchase investments with those contributions from options pre-selected by Defendants which are then allocated to Participants' individual accounts.

47.     The SIP is administered by the Committee, which is the Plan Administrator and named fiduciary.

48.     The Trust is administered by BNY Mellon Financial Corporation ("SIP Trustee").

49.     Pursuant to the Form 11-K, dated June 23, 2011 (the "2011 Form 11-K"):

> The Plan includes a salary reduction provision allowing eligible Kodak participants to defer up to a certain percentage of eligible compensation as defined in the Plan.  The maximum deferral for Plan years 2010 and 2009 was limited to 75% of the aggregate of eligible salary and certain related incentive compensation. Participants direct the investment of their contributions in 1% increments into various investment options offered by the Plan, which include common collective trusts, a stock fund, and a self-directed brokerage account.  Participants can invest in mutual funds through the self-directed brokerage account.  Participants are eligible to make transfers between investment funds on a daily basis.  Effective January 1, 2000, the Company began to match SIP contributions for an amount up to 3% of wages for employees who contributed up to 5% of their wages to SIP and who also

14

participated in the Cash Balance Plus portion of the Kodak Retirement Income Plan. Effective January 1, 2009, the Company suspended its matching contributions. Effective January 1, 2010, the Company reinstated the matching contributions. Company match funds cannot be used for loans or hardship withdrawals.

50. The 2011 Form 11-K further stated:

The Plan allows participants to invest in Company stock through the Kodak Stock Fund. At December 30, 2010 and 2009, the Plan held Kodak stock with a fair value of $30.3 million (5,484 shares) and $22.1 million (5,082 shares), respectively. During the year ended December 30, 2010, the Plan purchased shares in the Fund in the amount of $52.9 million, sold shares in the Fund in the amount of $51.3 million, and had net appreciation in the Fund in the amount of $7.2 million.

51. As of December 30, 2010, the Plan held $30,276,419 in Kodak Stock.

## A.    **The Plan Fiduciaries**

52.    ***Named Fiduciaries***. ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A). The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

53.    ***De Facto Fiduciaries***. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

54.     Each of the Defendants was a fiduciary with respect to the Plans and owed fiduciary duties to the Plans and their Participants under ERISA in the manner and to the extent set forth in the governing the Plans documents, through their conduct, and under ERISA.

55.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plans and the Plans' investments solely in the interest of the Plans' Participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

56.     Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plans' management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

## FACTUAL BASIS OF THE FIDUCIARY BREACHES

57.     Throughout the Class Period, Defendants knew or should have known that Kodak Stock, and thus the Fund, was an imprudent retirement savings option for the Plans due to the Company's exposure to losses and its ultimate bankruptcy on January 19, 2012, the Company Stock price would suffer and devastate Participants' retirement.  Yet, Defendants failed to protect the Plans and their Participants from entirely foreseeable losses.

58.     On January 28, 2010, the start of the Class Period, the Company filed with the Securities and Exchange Commission ("SEC") a Company press release on Form 8-K, announcing a Company loss of $232 million, or $0.87 per share, for 2009.  Upon information and belief, this Form 8-K was a fiduciary communication as it was incorporated into the Plans

16

documents.  The Company press release further stated in relevant part:

> On the basis of U.S. generally accepted accounting principles (GAAP), the company reported fourth-quarter earnings from continuing operations of $430 million, or $1.36 per share, compared with a loss on the same basis of $914 million, or $3.40 per share, in the year-ago period.  Items of net benefit that impacted comparability in the fourth quarter of 2009 totaled $90 million after tax, or $0.28 per share, primarily related to benefits from asset sales and tax-related items, partially offset by restructuring charges and other miscellaneous items.  Items of net expense that impacted comparability in the fourth quarter of 2008 totaled $893 million after tax, or $3.32 per share, primarily related to a goodwill impairment charge, restructuring charges, a legal contingency, and tax-related items.
>
> For full-year 2009, *the company reported a loss from continuing operations of $232 million, or $0.87 per share*.  This compares to a loss of $727 million, or $2.58 per share, in 2008. Full-year revenue totaled $7.606 billion, a 19% decline from 2008. Full-year digital revenue totaled $5.345 billion, a 17% decline from 2008, and traditional revenue totaled $2.257 billion, a 24% decline. *These results reflect the recession's impact on demand, especially in the first half of 2009*. The company expects that customer demand for its digital products will continue to grow, as the economy recovers.  (Emphasis added).

59.     On February 4, 2010, the Company filed with the SEC a Company press release on Form 8-K, announcing its forecasts for improved profitability in 2010.  Upon information and belief, this Form 8-K was a fiduciary communication as it was incorporated into the Plans documents.  The Company press release further stated in relevant part:

> At today's annual strategy meeting in New York City, the company's senior leaders will detail how Kodak will continue to improve performance in 2010 and beyond.
>
> For 2010, on a continuing operations basis, Kodak expects:
>
> • Segment earnings from operations of $350 million to $450 million on total company revenue of between $7.5 billion to $7.7 billion. This equates to GAAP earnings from continuing operations before interest expense, other income (charges), net and income taxes of $275 million to $375

million;

- 2010 GAAP earnings from continuing operations in the range of negative $50 million to positive $50 million;

- Digital revenue growth of 5% to 9%, and overall revenue growth of 0% to 1%;

- Positive cash generation before restructuring, and, on a GAAP basis, net cash provided by continuing operations from operating activities of $50 million to $150 million;

- A year-end cash balance of $1.8 billion to $2.0 billion, after taking into account all cash actions, including modest debt payments due during 2010.

"***Our strategy is working and we are on track toward sustained profitability***," said Antonio M. Perez, Chairman and Chief Executive Officer, Eastman Kodak Company. "***We are successfully managing through one of the deepest global economic downturns in history, and we have emerged as a leaner, more competitive company***. Today, Kodak is well-established in large markets, and we are gaining traction in new growth markets, with the broadest and most competitive portfolio of digital products in the company's history. We have solid liquidity and the financial flexibility necessary to fully implement our strategy. In 2010 and beyond, we will fully utilize the innovative thinking of Kodak people to drive sustainable, profitable growth and increase the value of this great company." (Emphasis added).

60.     On April 29, 2010, the Company filed with the SEC a Company press release on Form 8-K, announcing its first-quarter 2010 earnings from continuing operations of $119 million, or $0.40 per share on a diluted basis, on sales of $1.933 billion. This represented a $479 million year-over-year earnings improvement and reflected a previously announced intellectual property transaction and significantly improved operating results across all of the Company's key business segments. Upon information and belief, this Form 8-K was a fiduciary communication as it was incorporated into the Plans documents. The Company press release further stated in relevant part:

18

"***Our first quarter performance is additional proof that our strategy is working and we continue to make progress toward our goals***," said Antonio M. Perez, Chairman and Chief Executive Officer, Eastman Kodak Company. "I am particularly pleased with the performance of our core growth businesses -- Consumer Inkjet, Commercial Inkjet, Workflow Software and Solutions, and Packaging Solutions. Combined first-quarter revenue for these product lines grew by 14% and gross profits improved by more than $20 million. We also continue to make significant operational improvements in the rest of our digital businesses, including digital cameras and devices, image sensor solutions, electrophotographic solutions and prepress solutions. Our Film, Photofinishing and Entertainment business continues to deliver improved profitability, despite a challenging marketplace. We're off to a good start for 2010, and I am optimistic about the year." (Emphasis added).

61.    On that same date, the Company filed with the SEC its first-quarter financial statement ("1Q Form 10Q"). Upon information and belief, this 1Q Form 10-Q was a fiduciary communication as it was incorporated into the Plans documents. The 1Q Form 10-Q further stated in relevant part:

***Despite continuing challenges in the global economy, the Company achieved improved profitability and cash flow in the first quarter of 2010 as compared with the prior year quarter, while realizing the benefits of a leaner cost structure and continuing to invest in innovative, higher-margin digital products***. For 2010, the Company will leverage its expanding portfolio of digital and traditional businesses, and will continue its focus on operational efficiency, to deliver on its revenue, earnings, and cash flow goals for the year. The Company will continue to work with its suppliers to mitigate any impact of an industry-wide electronic components supply constraint on its full year digital revenue growth. In addition, the Company is monitoring the impact of foreign exchange, particularly the euro which has weakened as compared with the U.S. dollar since year-end 2009, and is implementing operational counter-measures to mitigate any potential adverse impacts to revenues and earnings on the assumption that exchange rates could remain in the current range for some time. (Emphasis added).

62.    On July 28, 2010, the Company filed with the SEC a Company press release on Form 8-K, announcing its second-quarter 2010 results that reflected continued acceleration of the

Company's major growth businesses in commercial and consumer inkjet, unit growth in the Company's largest digital businesses, the continued decline of its traditional business, and operational improvements.  The Form 8-K further announced (i) revenue from the Company's digital commercial printing businesses grew 9% in the second quarter, including 18% growth in commercial inkjet printing; (ii) consumer inkjet printer and ink revenue grew by 50% in the second quarter; and (iii) profits from the Company's digital portfolio showed year-over-year improvement for the third consecutive quarter.  Upon information and belief, this Form 8-K was a fiduciary communication as it was incorporated into the Plans documents.   The Company press release further stated in relevant part:

> "***We continue to gain share in our growth businesses, maintain cost discipline, and drive improved profitability***," said Antonio M. Perez, Chairman and Chief Executive Officer, Eastman Kodak Company.  "Our new digital businesses, particularly consumer and commercial inkjet, continue to gain traction, with sales growth outpacing the competition.  Digital commercial printing revenue, for example, grew 9% in the second quarter, consumer inkjet printer and ink revenue grew 50%, and operating margins improved in the majority of our digital product lines and for our digital business in total.  We remain focused on building a leaner, more competitive company powered by innovative products that compete in large, new markets.  Given the solid digital unit growth that we saw in the first half of the year, we continue to target full-year revenue of $7.5 billion to $7.7 billion, reflecting the increasing strength of our digital portfolio."  (Emphasis added).

63.    On that same date, the Company filed with the SEC its second-quarter 2010 results ("2Q Form 10-Q").  Upon information and belief, this 2Q Form 10-Q was a fiduciary communication as it was incorporated into the Plans documents.   The 2Q Form 10-Q further stated in relevant part:

> In the first quarter of 2010, the Company issued $500 million of 9.75% senior secured notes due March 1, 2018.   The net proceeds of this issuance were used to repurchase all of the 10.5% senior secured notes due 2017 ($300 million) and to fund the tender of

$200 million of the Company's 7.25% senior notes due 2013. *These financing transactions provide the Company with increased financial flexibility* resulting from extended maturity dates. The next significant debt maturity is in 2013, and the majority of the Company's debt is due in 2017 and beyond. (Emphasis added).

64.     On October 28, 2010, the Company filed with the SEC a Company press release on Form 8-K, announcing its third-quarter 2010 results that reflect (i) continued momentum of the Company's major strategic digital growth businesses; (ii) improved operating efficiencies; and (iii) the successful conclusion of an intellectual property licensing agreement, all contributing to year-over-year improvement in profitability and positive cash generation. Upon information and belief, this Form 8-K was a fiduciary communication as it was incorporated into the Plans documents. The Company press release further stated in relevant part:

> "*Our third-quarter performance was marked by continued acceleration in our strategic digital growth businesses, positive cash generation, improved profit margins, and continued operational improvements across the company*," said Antonio M. Perez, Chairman and Chief Executive Officer, Eastman Kodak Company. "I am particularly pleased with the performance of our core growth businesses -- Consumer Inkjet, Commercial Inkjet, Packaging Solutions, and Workflow Software and Services. Revenue growth in these businesses continues to accelerate and in the third-quarter grew by a combined 23%. We also enjoyed growth in equipment unit placements, which will drive future consumable sales. All of these factors give me increased confidence that we are on track for a strong fourth-quarter performance, and continued improvement as we move forward." (Emphasis added).

65.     On that same date, the Company filed with the SEC its third-quarter 2010 ("3Q Form 10-Q"). Upon information and belief, this 3Q Form 10-Q was a fiduciary communication as it was incorporated into the Plans documents. The 3Q Form 10-Q further stated in relevant part:

> In the first quarter of 2010, the Company issued $500 million of

9.75% senior secured notes due March 1, 2018.  The net proceeds of this issuance were used to repurchase all of the 10.5% senior secured notes due 2017 ($300 million) and to fund the tender of $200 million of the Company's 7.25% senior notes due 2013. ***These financing transactions provide the Company with increased financial flexibility*** resulting from extended maturity dates.  The next significant debt maturity is in 2013, and the majority of the Company's debt is due in 2017 and beyond. (Emphasis added).

66.     On January 26, 2011, the Company filed with the SEC a Company press release on a Form 8-K, announcing its 2010 results which reflected the success of the focused investments that the Company was making in new products and growth businesses; digital revenue growth in key emerging markets around the world; intellectual property licensing agreements; improved profit margins; and a lean cost structure.  Upon information and belief, this Form 8-K was a fiduciary communication as it was incorporated into the Plans documents. The Company press release further stated in relevant part:

"In a year with significant external headwinds affecting a number of industries in which we participate, ***I am very encouraged by the performance of our key digital growth businesses, which will form the basis of Kodak's digital future***," said Antonio M. Perez, Chairman and Chief Executive Officer, Eastman Kodak Company. "During 2010, these new businesses grew by a combined 18%, and all of our digital businesses as a group delivered more than $300 million in earnings for the year.  This was our best digital earnings performance ever, and in line with our segment earnings forecast for the year. We also delivered positive cash generation in the fourth quarter and ended the year with more than $1.6 billion in cash on our balance sheet.   That said, there were particular business challenges in 2010 that we are aggressively addressing. We enter the new year with a highly competitive digital portfolio, a strong presence in key markets, a continued commitment to effective cash management, and a significant amount of positive momentum in our key growth initiatives.  ***All of this positions us well to continue our progress as a profitable, digital company***." (Emphasis added).

67.     On February 3, 2011, the Company filed with the SEC a Company press release on a Form 8-K, announcing plans to complete its transformation into a digital company with sustainable profits by 2012.   Upon information and belief, this Form 8-K was a fiduciary communication as it was incorporated into the Plans documents.   The Company press release further stated in relevant part:

> "*The success of our core growth businesses demonstrates that our strategy is working*," said Antonio M. Perez, Chairman and Chief Executive Officer, Eastman Kodak Company.   "Over the next three years, we will continue to improve our digital performance, as our core growth businesses begin to achieve profitability this year and turn profitable as a group in 2013.   *We are also well-positioned in several large and established digital markets, and we are committed to managing those businesses to maximize earnings and cash generation*.   We have sufficient resources and the financial flexibility necessary to fully implement our strategy and deliver shareholder value."  (Emphasis added).

68.     On February 25, 2011, the Company filed with the SEC a Company press release on a Form 8-K, announcing that the Company filed its 2010 Annual Report on Form 10-K with the SEC.   The Company press release further stated that "[a]s a result of goodwill impairment testing conducted by the Company between January 26, 2011 and February 25, 2011, the Company's net loss, as previously furnished on Form 8-K on January 26, 2011, has been revised to reflect a non-cash goodwill impairment charge.   Net loss has also been revised from the amount reported on January 26, 2011 due to a change in estimate which decreased an accrual by $7 million."

69.     On that same date, the Company filed with the SEC its year end 2010 financials ("2010 Form 10-K").   Upon information and belief, this 2010 Form 10-K was a fiduciary communication as it was incorporated into the Plans documents.

70.     By the close of the year end of 2010, the Company reported a 95% drop in profits.

71.   On April 28, 2011, the Company filed with the SEC a Company press release on Form 8-K, announcing its first-quarter 2011 results that reflected continued momentum of the Company's core digital growth businesses and improved cash performance.  Upon information and belief, this Form 8-K was a fiduciary communication as it was incorporated into the Plans documents.  The Company press release further stated in relevant part:

> "*Our strategy is working*," said Antonio M. Perez, Chairman and Chief Executive Officer, Eastman Kodak Company. "*We saw continued momentum in our strategic digital growth businesses, revenue growth in several of our established digital businesses, and improved cash performance, all of which position us well to achieve our two key financial metrics for the year related to growth and cash*."  (Emphasis added).

72.   On that same date, the Company filed with the SEC its first-quarter 2011 results ("1Q 2011 Form 10-Q").  Upon information and belief, this 1Q 2011 Form 10-Q was a fiduciary communication as it was incorporated into the Plans documents.  The Company' s 1Q 2011 Form 10-Q further stated in relevant part:

> Revenue and profitability for the quarter as compared with the prior year quarter declined primarily due to a non-recurring intellectual property licensing arrangement in the first quarter of 2010 and were also negatively impacted by secular volume declines and increased commodity costs, particularly silver, in the Film, Photofinishing, and Entertainment Group (FPEG) segment.

73.   By the end of June 2011, the Company had liabilities exceeding its assets by $1.4 billion.  Further, the Company's stock price had lost over three-quarters of its value since the start of 2011.

74.   On July 26, 2011, the Company filed with the SEC a Company press release on a Form 8-K, announcing its second-quarter 2011 results that reflected a continued momentum of the Company's core digital growth businesses, increased raw material costs, continued investment in certain growth businesses, and cash performance which reflects the Company's

seasonal pattern.  Upon information and belief, this Form 8-K was a fiduciary communication as it was incorporated into the Plans documents.  The Company press release further stated in relevant part:

> "We are enjoying success in our new growth businesses, as well as the challenges typical in the creation of new businesses based on revolutionary new technologies," said Antonio M. Perez, Chairman and Chief Executive Officer, Eastman Kodak Company. "We have ambitious goals for our growth businesses, and thus far have achieved impressive results against the industry.  Revenue growth in these businesses is accelerating, with second-quarter 2011 growth more than double the year-ago period.  We are also on track this year to once again double ink gross profit dollars in our Consumer Inkjet business, and we're enjoying strong customer demand for KODAK PROSPER Presses.
>
> "We are investing in these growth businesses to create a new profitable, sustainable digital company by 2012," Perez said. "At the same time, we continue to fund legacy liabilities associated with the traditional businesses.  This was especially evident in our cash usage during the second quarter, in which we typically use cash because of seasonal patterns. ***We have every expectation our cash flow pattern this year will mirror the pattern of previous years, with sizeable cash generation in the second half of the year, primarily in the fourth quarter. In summary, while we continue to face challenges, I remain confident in Kodak's future and in our ability to maintain the investments necessary to complete our transformation***."   (Emphasis added).

75.     On that same day, the Company filed with the SEC its second-quarter 2011 results ("2Q 2011 Form 10-Q").  Upon information and belief, this 2Q 2011 Form 10-Q was a fiduciary communication as it was incorporated into the Plans documents.   The 2Q 2011 Form 10-Q further stated in relevant part:

> The Company has taken the following actions in 2011 designed to provide continued financial flexibility:
>
> - Issued $250 million of Senior Secured Notes due 2019. The proceeds from this issuance were used to repurchase $50 million of Senior Notes due 2013, with the remaining amount being used for other general corporate purposes.

- Entered into a Second Amended and Restated Credit Agreement with its lenders, which extends the current asset-based revolving credit facility and favorably amends certain covenants.

- Completed sales of certain non-strategic businesses and assets and received $76 million of cash.

76.     On September 26, 2011, the Company initiated a draw of $160 million under the Second Amended and Restated Credit Agreement, raising fears about its liquidity.

77.     On September 30, 2011, trading on the Company's Stock was temporarily halted. In a single day, the Company lost over 50% of its value before trading was halted.

78.     On November 3, 2011, the Company filed with the SEC a Company press release on Form 8-K, announcing its steady progress toward becoming a profitable and sustainable digital company as third-quarter digital earnings improved, excluding non-recurring patent licensing revenue in the prior-year period, and sales increased in its core digital growth businesses.  Upon information and belief, this Form 8-K was a fiduciary communication as it was incorporated into the Plans documents.  The Company press release further stated in relevant part:

> "*More than anything, the results of this quarter reflect our continued progress toward establishing digital growth businesses that will form the nucleus of a new Kodak*," said Antonio M. Perez, Chairman and Chief Executive Officer, Eastman Kodak Company.  […]
>
> "As for our cash-generating businesses, the digital product lines, led by Digital Cameras & Devices, significantly improved their cash and earnings performance in the quarter on an operational basis, and we expect the improved performance to continue in the fourth quarter and through 2012," Perez said.  "Our traditional business also generated a profit despite significant headwinds from high raw material costs, especially silver.
>
> "We now expect to end the year with as much as $1.4 billion in

cash, before any proceeds from the sale of our digital imaging patent portfolios, reflecting the company's seasonal generation of cash in the fourth quarter," Perez said. "Remember as well that the eventual sale of our digital patent portfolios will materially increase our cash balance and help to accelerate our efforts to complete the transformation. What's more, 2011 represents the peak year for cash usage by our business units during this transformation. In 2012, we expect cash usage attributed to the operating businesses to decline notably, stemming from significant profitability improvements in consumer and commercial inkjet as well as digital cameras. We remain confident that we are creating a digital Kodak that will help our customers grow their business through high-quality and innovative products and services. We continue to make progress against that goal, and we look forward to reporting additional progress in the months ahead." (Emphasis added).

79.    On that same date, the Company filed with the SEC its third-quarter 2011 results ("3Q 2011 Form 10-Q"). Upon information and belief, this 3Q 2011 Form 10-Q was a fiduciary communication as it was incorporated into the Plans documents. The 3Q 2011 Form 10-Q further stated in relevant part:

> The Company has taken the following actions in 2011 to enhance its cash position:
>
> •    Issued $250 million of Senior Secured Notes due 2019. The proceeds from this issuance were used to repurchase $50 million of Senior Notes due 2013, with the remaining amount being used for other general corporate purposes.
>
> •    Entered into a Second Amended and Restated Credit Agreement with its lenders, which extended the asset-based revolving credit facility and favorably amended certain covenants and subsequently initiated a draw of $160 million under the Second Amended and Restated Credit Agreement.
>
> •    Completed sales of certain non-strategic businesses and assets and received $94 million of cash.

80.    On January 3, 2012, the Company announced that it received a continued listing standards notice from the New York Stock Exchange ("NYSE") because the average closing

27

price of the Company's Stock was less than $1.00 per share over a period of thirty (30) consecutive trading days.

81.     On January 19, 2012, the Company announced that it and its U.S. subsidiaries filed voluntary petitions for Chapter 11 business reorganization in the U.S. Bankruptcy Court for the Southern District of New York.

82.     Throughout the Class Period, Defendants issued a series of Form 10-Ks, 10-Qs, and 8-Ks that failed to fully acknowledge the continued adverse repercussions to the Company's business and financial results.  Despite this fact, Defendants took no action to protect the Plans' assets.  Instead, Defendants imprudently allowed the Plans to continue offering Kodak Stock as an investment option and they continued to invest the Plans' assets in Kodak Stock when it was no longer prudent to do so.

## THE LAW UNDER ERISA

83.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

84.     ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

85.     ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the

28

interest of the Participants and beneficiaries, for the exclusive purpose of providing benefits to Participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

86.     These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence, and are the "highest known to the law."  They entail, among other things:

(a)     the duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance the Plan, which invested in Kodak Stock, to ensure that each investment is a suitable option for the Plan;

(b)     the duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the Participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Plans' sponsor; and

(c)     a duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of Participants and beneficiaries.

87.     ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that ". . . [i]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following

circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 404(a)(l), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

88.     Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plans arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(l) and ERISA § 405(a).

## DEFENDANTS' FIDUCIARY STATUS

89.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(l), 29 U.S.C. § 1102(a)(l).

90.     During the Class Period, all of the Defendants acted as fiduciaries of the Plans pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A) and the law interpreting that section. As outlined herein, Defendants all had discretionary authority and control with respect to the management of the Plans and/or the management or disposition of the Plans' investments and assets, and/or had discretionary authority or responsibility for the administration of the Plans.

91.     During the Class Period, Defendants' direct and indirect communications with the Plans' Participants included statements regarding investments in Kodak Stock.   Upon information and belief, these communications included, but were not limited to, SEC filings, annual reports, press releases, Company presentations made available to the Plans' Participants

via the Company's website and the plan-related documents which incorporated and/or reiterated these statements.  Defendants also acted as fiduciaries to the extent of this activity.

92.     In addition, under ERISA, in various circumstances, non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable.  To the extent any of the Defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the breaches of fiduciary duty described below.

## CAUSES OF ACTION

## COUNT I

93.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

94.     At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

95.     As alleged above, Defendants were responsible, in different ways and to differing extents, for the selection and monitoring of the Plans' investment options, including the option of Kodak Stock.

96.     Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in Kodak Stock in the Plans were prudent and that such investment was consistent with the purpose of the Plans.  Defendants are therefore liable for losses incurred as a result of such investments being imprudent.

97.     A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

98.     Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to prevent the Plans, and indirectly the Plans' Participants and beneficiaries, from suffering losses as a result of the Plans' investment in Kodak Stock.

99.     The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

100.    Defendants breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the failure to prudently and loyally manage the Plans' assets with respect to offering Kodak Stock as an investment option in the Plans; enabling Defendants' failure to prudently manage the Plans' assets with respect to the Plans' investments; and, having knowledge of the failure to prudently manage the Plans' assets, yet not making any effort to remedy the breach.

101.    Specifically, at least some of the Defendants had actual knowledge of Kodak's questionable reporting and business.  In addition, in light of their high-ranking positions as high

ranking officers at the Company, Defendants had/should have had constructive knowledge of these activities.

102.    Despite this knowledge, Defendants participated in each other's failures to prudently manage the Plans' assets and knowingly concealed such failures by not informing Participants that the Plans' holdings of Kodak Stock were not being prudently managed.  They also failed to remedy their mutual breaches of the duty to prudently manage the Plans' investment in Kodak Stock, despite inarguably having knowledge of such breaches.

103.    Furthermore, through their own failure to prudently and loyally manage the Plans' investment in Kodak Stock, or to undertake any genuine effort to investigate the merits of such investment, or to ensure that other fiduciaries were doing so, Defendants enabled their co-fiduciaries to breach their own independent duty to prudently and loyally manage the Plans' investment in Kodak Stock.

104.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plans' other Participants and beneficiaries, lost a significant portion of their investments meant to help Participants save for retirement.  Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

105.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

106.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

107.     As alleged above, the scope of Defendants' fiduciary duties and responsibilities included disseminating the Plan documents and information to Participants regarding the Plans and assets of the Plans.   In addition, Defendants had a duty to provide Participants with information they possessed that they knew or should have known, would have an extreme impact on the Plans.

108.     The duty of loyalty under ERISA requires fiduciaries to speak truthfully to Participants, not to mislead them regarding the Plans or the Plans' assets, and to disclose information that Participants need in order to exercise their rights and interests under the Plans. This duty to inform Participants includes an obligation to provide Participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing inaccurate material information regarding the Plans' investment options such that Participants can make informed decisions with regard to investment options available under the Plans, this duty applies to all of the Plans' investment options, including investment in Kodak Stock.

109.     Upon information and belief, such communications were disseminated directly to all Participants, which incorporated by reference the Company's inaccurate SEC filings and reports furnished by Kodak, through its officers.  In addition, upon information and belief, the Company communicated directly with all Participants regarding the merits of investing in Kodak Stock in company-wide and uniform communications, and, yet, in the context of such communications failed to provide complete and accurate information regarding Kodak Stock as required by ERISA.

110.     In addition, Defendants were responsible for providing Participants in the Plans with investment education and communication.  Defendants, however, failed to disclose any information to the Plans Participants regarding Kodak's business practices and how these

activities adversely affected Kodak Stock as a prudent investment option under the Plans. Defendants thus breached their duty to provide Participants with complete and accurate information necessary for making informed investment decisions with regard to investment options under the Plans.

111.    Defendants breached their duty to inform Participants by failing to provide complete and accurate information regarding Kodak Stock, making material misrepresentations about the Company's financial condition, and, generally, by conveying inaccurate information regarding the soundness of Kodak Stock and the prudence of investing retirement contributions in the Company's stock.

112.    These failures were particularly devastating to the Plans and the Participants, as a certain percentage of the Plans' assets were invested in Kodak Stock during the Class Period and, thus, the Company Stock's precipitous decline had an enormous impact on the value of Participants' retirement assets.

113.    In addition, Defendants knew or should have known that information they possessed regarding the true condition of Kodak would have an extreme impact on the Plans. Yet, in violation of their fiduciary duties, these Defendants failed to provide Participants with this crucial information.

114.    As a consequence of the failure of Defendants to satisfy their disclosure obligations under ERISA, Participants lacked sufficient information to make informed choices regarding investment of their retirement savings in Kodak Stock, or to appreciate that under the circumstances known to the fiduciaries, but not known by Participants, Kodak Stock was an inherently unsuitable and inappropriate investment option for their plan accounts.  Had accurate information been provided, Participants could have protected themselves against losses

accordingly, and consequently, Participants relied to their detriment on the incomplete and inaccurate information provided by Defendants in their fiduciary communications and failures thereof.

115.   As a consequence of Defendants' breaches of fiduciary duty alleged in this Count, the Plan suffered tremendous losses.  If Defendants had discharged their fiduciary duties to prudently invest the Plans' assets, the losses suffered by the Plan would have been minimized or avoided.   Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the other Class members, lost millions of dollars of retirement savings.

116.   Pursuant to ERISA §§ 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III

117.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

118.   At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  At all relevant times, as alleged above, the scope of the fiduciary responsibilities of Director Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries.   The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.

119.   The monitoring fiduciaries, Director Defendants had the duty to:

(a)   Ensure that the appointed the Plans fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.

They must be knowledgeable about the operations of the Plans, the goals of the Plans, as noted above, and the behavior of the Plans' Participants;

(b)      Ensure that the appointed the Plans fiduciaries are provided with adequate financial resources to do their job;

(c)      Ensure that the appointed the Plans fiduciaries have adequate information to do their job of overseeing the Plans' investments;

(d)      Ensure that the appointed the Plans fiduciaries have ready access to outside, impartial advisors when needed;

(e)      Ensure that the appointed the Plan fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plans' investment options; and

(f)      Ensure that the appointed the Plans fiduciaries report regularly to the Company, the Company must then review, understand, and approve the conduct of the hands-on fiduciaries.

120.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.   In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

121.    The Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the appointed plan fiduciaries were given adequate

information about the Company's business problems alleged above, which made Kodak Stock an imprudent investment, which was necessary for them to perform their duties of overseeing the Plans' investments, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment by rank and file employees in an undiversified employer stock fund which was made up primarily of Kodak Stock, an investment that was imprudent and inherently subject to significant downward movements, especially here where the stock was artificially inflated by non-public corporate malfeasance and illicit activities.

122.    The Director Defendants also breached this duty by not properly disclosing information, that they knew or should have known, about the Company's business practices to the Trustee.   The Trustee is responsible for investing and managing assets of the Plans. However, in doing so, the Trustee shall be subject to the direction and guidance of Kodak.

123.    Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (a) imprudently allowing the Plans to continue offering Kodak Stock as an investment alternative for the Plans, and (b) continuing to invest the assets of the Plans in Kodak Stock when it no longer was prudent to do so.  Despite this knowledge, the Director Defendants failed to take action to protect the Plans, and concomitantly the Plans' Participants, from the consequences of these fiduciaries' failures.

124.    Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the appointed plan fiduciaries, they enabled the breaches by these Director Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

125.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other Participants and beneficiaries, lost a significant portion of their investments meant to help Participants save for retirement.

126.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C., § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

127.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

128.     At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

129.     ERISA § 404(a)(l)(A), 29 U.S.C. § 1104(a)(l)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the Participants and beneficiaries and for the exclusive purpose of providing benefits to Participants and beneficiaries.

130.     Given the allegations listed above, Defendants clearly placed the interests of themselves and the Company, as evidenced by the longstanding artificial inflation of Kodak Stock, before the interests of the Plans and their Participants and beneficiaries.  These conflicts of interest put Defendants in the inherently problematic position of having to choose between their own interests as directors, officers, executives, and the interests of the Plans' Participants and beneficiaries, in whose interests Defendants were obligated to loyally serve with an "eye single."

131.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to engage independent fiduciaries who could make independent judgments concerning the Plans' investment in Kodak Stock; failing to notify appropriate federal agencies, including the SEC of the facts and transactions which made Kodak Stock an unsuitable investment for the Plans; failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company and themselves above the interests of the Participants with respect to the Plans' investment in Kodak Stock.

132.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for:

A.    A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.    An Order compelling Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the Participants would have made if Defendants had fulfilled their fiduciary obligations;

C.    Imposition of a constructive trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

D.      An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

E.      Actual damages in the amount of any losses the Plans suffered, to be allocated among the Participants' individual accounts as benefits due in proportion to the accounts' diminution in value;

F.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.      An Order for equitable restitution and other appropriate equitable monetary relief against Defendants

Dated:  February 6, 2012

**BLITMAN & KING LLP**

By: */s Jules L. Smith*
    Jules L. Smith
The Powers Building, Suite 500
16 West Main Street
Rochester, New York 14614
Telephone: (585) 232-5600
Facsimile: (585) 232-7738
Email: jlsmith@bklawyers.com

**GAINEY & McKENNA**
Thomas J. McKenna
440 Park Avenue South, 5th Floor
New York, NY  10016
Telephone: 212-983-1300
Facsimile: 212-983-0380
Email: tjmckenna@gaineyandmckenna.com
Email: tjmlaw2001@yahoo.com

**WOLF HALDENSTEIN ADLER
    FREEMAN & HERZ LLP**
Mark C. Rifkin
270 Madison Ave.
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

Email: rifkin@whafh.com

**EGLESTON LAW FIRM**
Gregory M. Egleston
440 Park Avenue South
New York, NY  10016
Telephone: (212) 683-3400
Facsimile: (212) 683-3402
Email: egleston@gme-law.com

*Attorneys for Plaintiff*